**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

EMMANUEL E. SEWELL                      *

    Plaintiff                          *

          v                  *          Civil Action No. DKC-15-3040

BOBBY P. SHEARIN, *et al*.               *

    Defendants                         *
                            ***

## <u>MEMORANDUM OPINION</u>

Pending is a motion to dismiss filed by Defendant C. Coble (ECF No. 17) and motions to dismiss or in the alternative for summary judgment filed by Defendants Lori Clark, RN and Colin Ottey, MD (ECF No. 21) and Defendants M. Bible, Chelsea Finucane, Henrich, Lt. Boozel, Lt. D. Newlin, Bobby P. Shearin, and Amber Ward (ECF No. 24). Plaintiff opposes the motions. ECF No. 26 and 29. Defendants Clark, Ottey, and Coble have replied. ECF Nos. 27 and 28. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the complaint shall be dismissed as to Defendant Coble and the remaining motions to dismiss or for summary judgment, construed as motions for summary judgment, shall be granted in favor of Defendants Clark, Ottey, Bible, Finucane, Henrich, Boozel, Newlin, Shearin and Ward.

### **Background**

#### <u>Prior Litigation</u>

Plaintiff Emmanuel Sewell previously filed a civil rights action while he was incarcerated at North Branch Correctional Institution (NBCI), alleging that: his legal mail was being confiscated on a regular basis; his legal pleadings were sometimes given to jailhouse lawyers who altered the papers before they were mailed to the intended party; correctional officers were

permitting Sunni Muslims and prison gang members to harass him; and prison officials were failing to take measures to protect him from the violence of other inmates. *See Sewell v. Shearin, et al.*, Civil Action DKC-12-2656 (D. Md.) at ECF Nos. 1 and 4. On March 22, 2013, summary judgment was granted against it after evidence was produced that established: Sewell received legal mail on a regular basis and papers he alleged were not filed had been docketed; his claims of harassment were without any objective evidence and were based solely on Sewell's subjective beliefs; and Sewell's global assertions that everyone he encounters intends to harm him did not qualify as a known risk of harm from which prison officials were required to protect him. *Id*. at ECF Nos. 18 and 19. Sewell appealed this court's decision (*id*. at ECF No. 22) to the Fourth Circuit Court of Appeals and the judgment of this court was affirmed (*id*. at ECF Nos. 27 and 30).

Complaint Allegations

Sewell initiated this civil rights action by filing a pleading entitled "Declaration of Ongoing Mail Tampering and Failure to Process Complaints in Accordance to Regulations." ECF No. 1.[1] In that initial pleading Sewell, who is incarcerated at Roxbury Correctional Institution (RCI) in Hagerstown, Maryland, alleged that prison officials at RCI and NBCI were working together to hinder his access to the courts. *Id*. at p. 1. Specifically, he claims that he filed an appeal with the Fourth Circuit Court of Appeals on February 23, 2015, but, in a manner he does not describe, prison staff at RCI and NBCI hindered his "ability to access the Court's Declaration filed along with letters to the Warden and Asst. Warden of RCI." *Id*.

Sewell further states that on March 10, 2015, Assistant Warden Denise Morgan "designated Mrs. Amber Ward, Chief Psy. to continue assisting" him by "mailing the appeal to

---

[1] The pleading was construed as a civil rights complaint pursuant to 42 U.S.C. § 1983 and Sewell was directed to supplement the allegations raised. ECF No. 2.

[the] Fourth Circuit." ECF No. 1 at p. 1. The appeal was not docketed until March 23, 2015, and Sewell states that the appeal had to be resubmitted twice. *Id.* Sewell states, again without description, that "Case Management, Psychology, specific supervisors and subordinates of RCI staff are engaging in the same personal abuse as [NBCI] staff by prejudicing [his] ability to file legal claims and causing confusion so that my cases be dismissed." *Id.* at pp. 1 – 2. He states that he had to request "crisis intervention" with the appellate court. *Id.* at p. 2.

Sewell claims he wrote "multiple letters" to the Warden at RCI. He states he gave the letters and a "referral complaint dated July 11, 2015," to Amber Ward because Warden Richard Miller did not respond or did not receive them. Ward told Sewell she would make sure the warden received the documents. ECF No. 1 at p. 2. Sewell states that on September 4, 2015, he sent three "referral complaints" to Commissioner of Correction Wayne Webb. Sewell alleges without explanation that "they consistently deny [his] rights to due process by failing to follow their own regulations." *Id.*

In a letter dated September 4, 2015, addressed to Commissioner Webb, Sewell references the July 11, 2015 letter. ECF No. 1-1 at p. 2 (September 4, 2015 letter). He states that the letter, which he sent to Warden Miller, concerned his allegation of mail tampering at RCI. *Id.* He claims that Case Manager J. Sowers, A. Ward, C. Jollife, Lt. Boozel, Officer Weaver, Officer Roach, and Officer M. Bible engaged in mail tampering, but does not explain the manner in which it occurred. *Id.* He states that his complaint to the Warden was never investigated and that "after some time passed [his] mail has been able to go out." *Id.* Sewell remained dissatisfied because none of his personal documents had been retrieved, his postage stamps were not replaced, and no action was taken against "the inmates who were given my legal documents." *Id.* Sewell also informed Commissioner Webb that on August 23, 2015, he filed a

"referral complaint" regarding "medical poisoning" and "inducement of suicide" by manipulation of psychotic medications. ECF No. 1-1 at p. 2.

Sewell states that he "has an Eighth Amendment emergency" at RCI and alleges that correctional, medical, and pharmacy staff are poisoning him again. ECF No. 1 at p. 2. He maintains that this is being done by giving him "specific medicines causing toe nails to peel off, dizziness / fainting, unable to stand, loss of speech." *Id*. He states that when he asked "nurse Jamie" why the size of his pills were changing, he was told it was the pharmacy doing it. *Id*. When Sewell filed a complaint, the medication "suddenly change[d] back to chronic care meds." *Id*.

Sewell alleges that on September 21, 2015, the medications "used to induce suicide attempts were deleted by Psychiatry C. Coble right in front of me." *Id*. He claims that prison staff refused to investigate his complaint and they are failing to follow regulations that require them to act. *Id*. at p. 3.

In his first supplemental complaint, Sewell alleges that he is being deprived of his First, Fifth, Sixth, Eighth and Fourteenth Amendment rights and seeks injunctive and declaratory relief as well as monetary damages. ECF No. 4 at p. 1. Sewell cites Maryland Regulations that require the Commissioner of Correction and managing officials to have a written policy that requires medical care for inmates and policies that prohibit: "disease and non-discriminatory animus," "reprehensible conduct," retaliation, mail tampering, and personal abuse. *Id*. at pp. 1 – 2, citing Code of Md. Admin Regulations (COMAR) 12.02.03.10C.27; 12.02.03.07; 12.02.03.11(10)(a); 12.02.20.02.F and Division of Correction Directives (DCD) 185-002(V)(I(F), DCD 250-1(C) and (D), DCD 50-2 *et seq.*, and DCD 50-6 *et seq.* Sewell states that these policies are

unconstitutional because they authorize intentional deprivations, are fundamentally unfair, and infringe on protected State and Federal rights.  *Id*. at p. 2.

Sewell alleges that he is the subject of discrimination because he is denied access to chronic care programs for treatment of post-traumatic stress disorder (PTSD).  ECF No. 4 at p. 2.  He states that other inmates with a PTSD diagnosis are granted access to a treatment program, but he is not.  *Id*.  Sewell claims that Amber Ward and Miudi Baker, RN, are excluding him from the program and when asked for the basis for his exclusion, they change the subject.  *Id*.  He further alleges that Ward and Baker helped "cause confusion" in his court cases, causing three prior civil actions in this court[2] and three state court cases regarding his immediate release to be dismissed.  *Id*.  He alleges that Ward and Baker accomplished this through "misrepresentation of [his] personal and legal communications and personal abuses."  *Id*.

Sewell claims that "evidence will be provided to the court" that will establish that "psychology staff, CMS, Inc. Medical Staff, supervisors and correctional staff at RCI" caused him to suffer another throat injury and have been "slipping [him] medications labeled to look like chronic care blood pressure [medication] and Ecotrin" but he was given something different.  ECF No. 4 at pp. 2 – 3.  He alleges that the conduct of RCI staff is the same as the conduct he alleged against staff at NBCI in a prior lawsuit.  *Id*.

Sewell states that on September 24, 2015, he was interviewed by Nurse Manager Lori Clark who saw "the additional bruises to [his] throat."  ECF No. 4 at p. 3.  Sewell claims that Clark disappeared after she told him he would be seen by a doctor as soon as possible, but he was not seen.  *Id*.  Sewell notes that this conduct is similar to conduct he alleged against Mary

---

[2]    Sewell lists Civil Actions: *Sewell v. Stouffer, et al.*, DKC-11-614 (D. Md.), *Sewell v. Stouffer, et al.*, DKC-11-1584 (D. Md.), and *Sewell v. Shearin, et al.*, DKC-12-2656 (D. Md.).  ECF No. 4 at p. 2.  All three cases were resolved on summary judgment, which Sewell opposed in each case, and all were appealed to the Fourth Circuit Court of Appeals where the judgments were affirmed.

Joe Sabetelli in Civil Action DKC-11-614.  *Id*.  He claims that the results of Clark's interview were never submitted.  *Id*.

On October 3, 2015, Sewell mailed a letter to Warden Miller which he claims was intercepted by Officer M. Bible.  ECF No. 4 at p. 3.  Sewell states that five days later he hand delivered a second copy of the letter to the Warden, who assured him he would get medical care. *Id*.  Sewell claims he is not receiving that medical care.  *Id*.

On October 13, 2015, the day Sewell received an Order from this court dated October 9, 2015, Sewell met with Dan Baumgardner, RN concerning an Administrative Remedy Procedure complaint (ARP).  ECF No. 4 at p. 3.  The ARP (#0521) concerned Sewell's allegation that he was suffering injuries related to his claim of poisoning.  Baumgardner informed Sewell that his chronic care medications do not cause the sort of injuries he was claiming.  *Id*.  Sewell responded, "that's what I've been saying for over 6 years now."  *Id*.  Those alleged injuries include:  peeling toenails; skin peeling from shin, shoulder, and collarbone; left neck muscle pains; right leg calf burning like nerve damage; urine turning "gold-like" and burning; "physical changes to [his] chest;" and rapid weight gain.  *Id*.

Sewell maintains that there have been several attempts on his life by food poisoning and by correctional officers setting him up to be targeted by other inmates.  Despite his many complaints that these actions are taking place, Sewell claims that nothing is done to remedy the problem.  *See* ECF No. 4-1 through 4-9 (ARPs and other institutional complaints asserting *inter alia* food tampering; failure to provide medically prescribed diet; food is not provided properly on trays; correctional officer deliberately infected Sewell with scabies via another inmate's infected clothes).

In his second amended complaint, Sewell alleges there is a "campaign" of conduct to prevent him from receiving proper chronic care medications for the purpose of causing him "serious/severe physical injuries (even death)."  ECF No. 5 at p. 3.  He claims that while he was confined at NBCI, Colin Ottey, M.D., made false entries in his medical records and prescribed medication to Sewell for his thyroid condition without his consent and without medical evaluation.  *Id.*

Sewell asserts that RCI medical staff are refusing to provide him with medical treatment for the injuries he suffered as a result of taking the wrong medications.  *Id.*

Sewell states that Amber Ward is interfering with his outgoing and incoming mail, which is preventing his release from prison.  He claims that Ward is also denying him adequate access to the courts while he has an appeal pending.  ECF No. 5 at p. 3.

Sewell alleges that Chelsea Finucane and Amber Ward are influencing other inmates to stalk, intimidate, harass, and threaten him.  ECF No. 5 at p. 3.  In addition, he states that officers on two shifts (7 to 3 p.m. and 3 to 11 p.m.) are interfering with mail from this court.  *Id.*

<u>Defendants' Response</u>

In support of their motion to dismiss or for summary judgment, Defendants Ottey and Clark provide the background for Sewell's chronic health conditions and efforts to address his belief that staff are conspiring against him.  ECF No. 21 at Ex. 1 and 2.  In his affidavit, Dolph Druckman, M.D., Acting Regional Medical Director at RCI, states that Sewell's medical history includes diagnoses of hypertension (high blood pressure), PTSD, depression disorder, hypothyroidism, hyperlipidemia (high cholesterol), and a mental health history that includes delusional disorder, depression, and suicide attempts.  ECF No. 21 at Ex. 2, p. 2, ¶4.  Because of his multiple chronic conditions, Sewell is a "chronic care patient" who is seen on a regular basis

for "chronic care clinic" evaluations. *Id.* at ¶ 5. Like other inmates, Sewell may also access medical staff between those evaluations by filing a sick call slip for medical complaints. *Id.*

Sewell's mental health conditions are treated by mental health providers who work for MHM Services, Inc., not medical staff. *Id.* at ¶ 6. Prescriptions provided to Sewell for treatment of his mental health conditions include Risperdal, Diphenhydramine Hcl, Perphenazine, Vistaril, Prozac, Doxepin, and Lithium Carbonate. *Id.*

Sewell's hypertension (high blood pressure) is exacerbated by the anxiety related to his mental health diagnosis, which causes stress. ECF No. 21 at Ex. 2, pp. 2 - 3, ¶ 7. His risk factors include his race (African American), a high salt intake, an inactive lifestyle, obesity, and being male. *Id.* Since 2013, Sewell's hypertension has been treated with medication that includes Hydrochlorothiazide, Metoprolol Tartrate, and low dose coated aspirin. *Id.* In February of 2014, Metoprolol Tartrate was replaced with Atenolol. *Id.*

On April 28, 2014, Sewell was found sitting on the floor of his cell with a laundry bag string tied loosely around his neck; custody staff notified medical staff that emergency care was required for Sewell. ECF No. 21 at Ex. 1, pp. 22 – 23. Medical staff noted that Sewell had ligature marks on his neck, he was drowsy, and his speech was garbled. *Id.* at p. 23. Sewell told the nurse attending to him that he didn't want to live and admitted he had taken 30 doxepin tablets (sleeping pills). *Id.* Sewell was sent by ambulance to a hospital and returned to Western Correctional Institution (WCI) infirmary on May 2, 2014. *Id.* at p. 27. When asked why he had been hospitalized, Sewell stated that he was hospitalized because of a drug reaction. *Id.* On May 3, 2014, Dr. Ava Joubert changed Sewell's prescription for Atenolol to one for Vepramil. *Id.* at p. 29. Sewell continued to take Verapamil from May 2014 to August 5, 2014. Atenolol

has a potential side effect of depression or anxiety; however, Sewell has tolerated it well since he was put back on that medication in August of 2014.  ECF No. 21 at Ex. 2, pp. 2 - 3, ¶ 7.

While recovering in the WCI infirmary, Sewell related to Dr. Ottey that he was "tired and worn out" because the "administration" won't leave him alone.  ECF No. 21 at Ex. 1, p. 31.  He further stated that "death row guys" were stalking him and that when he puts papers in to the warden or in the mail, the "death row guys" send someone to take them.  *Id*.  When Sewell was discharged from the infirmary back to NBCI general population on May 5, 2014, it was noted that his suicide ideation was ongoing and that he would be kept on suicide monitoring at NBCI.  *Id*. at pp. 32, 34 – 35.

In addition to the medications prescribed for Sewell's hypertension, he was placed on a cardiovascular and low sodium diet.  ECF No. 21 at Ex. 2, pp. 2 - 3, ¶ 7. Sewell is also encouraged to exercise more frequently and to work on reducing his weight.  *Id*.  In Druckman's medical opinion Sewell's hypertension has been well managed with the course of therapy chosen.  *Id*.

Sewell's hypothyroidism was identified in October 2014, which Druckman opines was possibly related to a Lithium Carbonate prescription provided by mental health providers in May, 2014.  ECF No. 21 at Ex. 2, p. 3, ¶ 8, *see also* Ex. 1, p. 40 (Dr. Ottey noting hyperthyroidism is asymptomatic and may be due to lithium therapy).  Druckman notes that low thyroid hormone levels are a possible side effect of taking Lithium Carbonate.  ECF No. 21 at Ex. 2, p. 3, ¶ 8.  A consultation between Sewell's mental health providers and medical care providers resulted in the decision to reduce the dosage of Lithium Carbonate from 300 mg to 150 mg in February 2015.  *Id*.  Sewell met with Christine Coble, CRNP, on February 16, 2015, for a follow-up appointment to discuss his non-compliance with the medication prescribed.  ECF No. 21 at Ex. 1, p. 51.

Coble noted that Sewell said he was not taking the medication because of side effects, but that he agreed to a decrease in his lithium prescription and to continue taking Prozac. *Id.*

The prescribed treatment for Sewell's hypothyroidism is the medication Synthroid, but the condition is not yet controlled due to Sewell's frequent non-compliance with taking the medication. ECF No. 21 at Ex. 2, p. 3, ¶ 8. Sewell's non-compliance was based on his belief that the medication was causing neck pain. *Id.* at p. 54. On June 30, 2015, Sewell complained of neck pain that radiated to his shoulder and an x-ray was ordered to rule out degenerative joint disease (DJD) or a bone lesion. *Id.* at p. 59. The July 8, 2015 x-ray of Sewell's neck indicated some mild degenerative changes at C4-C5 and C5-C6 with no acute disease or dislocation. *Id.* at p. 72. As of January 2016, Sewell is no longer prescribed Lithium Carbonate and the hyperthyroidism is routinely monitored in chronic care clinic. *Id.*

In an individual therapy session with Amber Ward, LCPC, on July 16, 2015, Sewell related that he had sent several packages of documents to a law firm in Mississippi for a case he is preparing, but the documents were not received. ECF No. 21 at Ex. 1, p. 61. Sewell showed Ward a letter from the law firm indicating the documents were not received and Ward called the law firm with Sewell present. *Id.* A legal assistant with whom Ward spoke confirmed they had not received the package from Sewell. *Id.* Ward discussed with Sewell the possible reasons why the mail had not been received and reminded Sewell that the only way to track his mail is to send it certified. *Id.* Sewell provided Ward with a pre-paid envelope addressed to the firm which she hand-delivered to the mail room and copies of a letter and an ARP he had sent to the Warden of RCI. *Id.* Sewell's belief – that staff are deliberately tampering with his mail – were discussed. *Id.* Sewell told Ward that he believes he is targeted by staff at RCI because he tried to expose things at NBCI that were unjust, and inmate workers in the segregation unit there were paid to

poison his food.  *Id.*  When Ward pointed out how unlikely it was that those beliefs were factual and asked Sewell if it could be a result of paranoid delusions, Sewell stated "that's what they want you to believe; that I am crazy."  *Id.*

Sewell's hyperlipidemia was diagnosed in October 2014 at which time he was prescribed Zocor.  ECF No. 21 at Ex. 2, p. 4, ¶ 9.  Initially Sewell was non-compliant with the medication, but became compliant.  *Id.*  Despite that compliance, however, Sewell's cholesterol levels remain elevated.  *Id.*  Druckman states that continuing the Zocor regimen in conjunction with a proper diet, exercise, and weight reduction should reduce Sewell's cholesterol levels.  *Id.*  Sewell is also routinely treated in chronic care clinic for this condition.  *Id.*

Druckman observes that Sewell's allegations that medical records were falsified by Dr. Ottey;[3] medications are being altered or inappropriate substitutions are being provided; and he is being poisoned by correctional officers, medical staff, and pharmacy staff, are all typical of unsubstantiated claims that are frequently made by patients with a mental health history like Sewell's that is significant for paranoia.  ECF No. 21 at Ex. 2, pp. 4- 5, ¶¶ 11 -14.  Moreover, Druckman states that other than the prescribed changes in Sewell's medications issued by doctors treating him, no other changes or substitutions have occurred with regard to his medications.  *Id.* at ¶ 12.  Druckman notes that occasionally the prison pharmacy may change brands and manufacturers for the medications carried, which could potentially result in a change in packaging, color, size, or inscriptions on tablets and capsules, but those types of changes do not alter the medication itself.  *Id.*, *see e.g.*, Ex. 1 at p. 79 (Sewell reported that his aspirin did not look the same and thought it was incorrect; pharmacy confirmed he was provided a generic version of Ecotrin), Ex. 1 at p. 82 (same concerns with both Ecotrin and Atenolol; same reassurance provided).

---

[3]   Dr. Ottey provides an affidavit denying the allegation.  ECF No. 21 at Ex. 3.

Druckman further notes that a review of Sewell's medical record revealed no instances where he was prescribed the wrong medication for any of the conditions with which he is diagnosed. ECF No. 21 at Ex. 2, pp. 4- 5, ¶13. Although Sewell has been reassured and educated regarding changes in appearance for his medication, he continues to assert his claim that the changes are nefarious. *Id*. at ¶ 12.

On November 17, 2015, a multidisciplinary patient care conference was held regarding Sewell's letters to the Warden claiming he was not receiving proper medical care or mental health services and stating his belief that his mail is being tampered with at RCI. ECF No. 21 at Ex. 1, p. 81. In attendance at the conference were the Warden, the Assistant Warden, Medical staff, Sewell's assigned Case Manager, the Case Management Supervisor, Psychology staff, Psychiatry staff, and members of the social work team. *Id*. Sewell joined the conference, told those in attendance that he was not coming out of his cell as much recently, and alluded to indirect threats he had received from other inmates. *Id*. He expressed his belief that correctional officers know about these threats, but act like they don't know. *Id*. Amber Ward, who prepared the notes regarding the conference, noted that Sewell expressed beliefs throughout the meeting that reflected a high level of paranoia and mistrust. *Id*.

Druckman explains that the list of symptoms Sewell claims are a result of the alleged poisoning (toe nails peeling, dizziness, fainting, loss of speech, etc.) are not typical side effects of the medications he is prescribed, but in rare cases could occur. ECF No. 21 at Ex. 2, ¶ 13. Despite Sewell's claims of these symptoms, Druckman notes that he has never sought treatment from medical providers for any of the claimed conditions, nor has he been observed by medical providers suffering from any of the symptoms alleged. *Id*.

On December 2, 2015, in another individual therapy session, Shakora Banks, PhD, reviewed with Sewell his history of mail tampering issues at four different prisons involving different staff members who did not know him prior to his arrival.  ECF No. 21 at Ex. 1, p. 84. Banks explored with Sewell why he would think this could or would occur and noted that Sewell simply smiled and replied "maybe it's just the Post Office."  *Id*.  Although Sewell began stating that correctional staff may not be tampering with his mail, Banks notes he was unable to maintain the thought.  *Id*.  Banks noted that Sewell's thought content "reveals delusions, obsessions."  *Id*. at p. 85.

Sewell discussed his paranoia and overall feeling of being uncomfortable with Christine Coble on December 10, 2015, when he was seen for treatment of his depression and PTSD.  ECF No. 21 at Ex. 1, p. 86.  Coble suggested adding Prolixin, an antipsychotic medication, to Sewell's treatment plan.  *Id*.  Sewell did not agree to it during their discussion, but said he would consider it.  *Id*.  His concern centered around prior side effects caused by Risperdal which he was provided previously.  *Id*.

In support of their motion to dismiss or for summary judgment, Defendants Bobby Shearin, Amber Ward, Chelsea Finucane, Lt. Scott Boozel, Lt. Donald Newlin, Steven Henrich, and Michael Bible provide information regarding Sewell's state court litigation, administrative remedy procedure complaints that were received and processed, in addition to affidavits.  ECF No. 24.  With regard to Sewell's claims that he is being held past the expiration of his sentence, Defendants state that on June 13, 1997, Sewell pled guilty to first-degree burglary, robbery, and first-degree sex offense in the Circuit Court for Montgomery County.  ECF No. 24 at Ex. 1. Sewell was sentenced to serve a total of 25 years.  *Id*.  On August 23, 2006, Sewell pled guilty to

second-degree assault on a Division of Correction employee and was given a four-year consecutive[4] sentence.[5] *Id.* at Ex. 2.

In addition to his litigation in this court and the related appeal in the Fourth Circuit, Sewell also filed a Petition for Writ of Habeas Corpus in the Circuit Court for Baltimore City on March 3, 2015, which was transferred to the Circuit Court for Montgomery County on July 30, 2015. ECF No. 24 at Ex. 3 and 4. Sewell sent three letters to the Montgomery County court on February 4, 2016 (two letters) and February 12, 2016. *Id.* at Ex. 4. The petition was denied by order dated February 1, 2016, and entered February 5, 2016, because Sewell failed to comply with Md. Rule 5-302(b)(2)(A – E). *Id.* at Ex. 5. That rule requires a state habeas petitioner to identify previous petitions filed, where they filed, the grounds raised, the determination made on each, whether appellate review was sought, and if appellate review was sought, the result of that review.

In her declaration under oath, Defendant Amber Ward explains that Sewell is enrolled in the Special Needs Unit (SNU) at RCI. ECF 24 at Ex. 6, p. 1, ¶ 3. The program includes group therapy, individual therapy, and monthly treatment team meetings and is designed to provide a continuum of care in a least restrictive environment, consistent with security and safety, for inmates who experience symptoms of a serious mental illness. *Id.* Ward was assigned as Sewell's therapist for the SNU program from November 10, 2014 to October 20, 2015. *Id.* at ¶ 4. With regard to the PTSD program, Ward explains that a referral from a staff member is not required to participate in the program; inmates simply apply. *Id.* at ¶ 8. Ward further states that

---

[4]    Under Md. Code Ann., Crim. Law § 3-210(b) a sentence imposed for this offense must be consecutive to any sentence being served or that was imposed and is not yet being served at the time of the assault.

[5]    Sewell's aggregate term of confinement is 29 years from June 13, 1997, making the maximum expiration date of his sentence June 13, 2026. Assuming Sewell was awarded the maximum amount of good conduct credits permitted under Maryland law (five days per month or 1740 total days) and none of those credits were revoked during his incarceration for disciplinary infractions, his mandatory release date would not occur until September 17, 2023.

Sewell never asked her about the program and, in any event, she is not involved in the process for placing inmates in the program.  *Id*. at ¶¶ 7 and 9.  Ward also states that she has never intercepted, altered, or interfered with Sewell's mail, nor has she encouraged anyone to stalk or harass Sewell, and she is unaware of any other employee at RCI engaging in such conduct.  *Id*. at ¶¶ 12 and 13.

Records of Ward's interactions with Sewell while she was his assigned therapist reflect that treatment focused on improving problem-solving skills and maintaining or improving his current level of functioning.  ECF No. 24 at Ex. 7, pp. 6 and 17.  On September 16, 2015, when Ward spoke with Sewell his habeas corpus petition was still pending in Montgomery County Circuit Court and he expressed hope that it would result in his release.  *Id*. at p. 6.  At that time Sewell admitted it was unlikely that correctional officers were tampering with his mail because he had not experienced any problems recently.  *Id*.  Ward noted that Sewell's depressive symptoms were adequately controlled.  *Id*.

On October 20, 2015, when Ward was speaking with Sewell for an individual counseling session, she received a call from Lt. Apple stating he needed to speak with Sewell on an emergent basis regarding a note he left on the desk of Social Worker E. Soffe following group therapy.  ECF No. 24 at Ex. 7, p. 17.  The note stated that Sewell felt his life was being threatened by members of the Black Guerilla Family (BGF), a prison gang.  *Id*.  Sewell admitted he left the note on Soffe's desk, claimed he had been "hearing things," and stated his belief that BGF members are making remarks about him.  *Id*.  When asked for specifics, Sewell stated that he heard legal mail had arrived for him on October 16th, but he never received it.  *Id*.  Lt. Apple suggested this was easy to verify, went to the mail room, and obtained a copy of the incoming legal mail log for that date.  *Id*.  Nothing was listed for Sewell for that date; the most recent entry

for incoming legal mail for Sewell was October 13th and that entry bore his signature, indicating he received it. *Id*. During this meeting Sewell gave Ward a letter which contained remarks appearing to indicate that Sewell believed their relationship extended beyond the therapeutic relationship;[6] thus, she asked for him to be reassigned to another therapist. *Id*.

On October 23, 2015, Sewell was seen by Shakora Banks, Ph.D. for individual therapy. ECF No. 24 at Ex. 7, p. 19. Banks discussed letters Sewell had written to the lead psychologist and the Assistant Warden, and Sewell stated that "his concerns were legal" and claimed Ward had engaged in misconduct. *Id*. When asked to explain, Sewell alleged that Ward had mishandled legal documents regarding his "pending release." *Id*. Banks noted that Sewell's perception of his relationship with Ward appeared "misconstrued." *Id*. Although Banks told Sewell that he would help him psychologically and that any legal work would need to be addressed with his lawyer, Sewell continued to talk about his mail being mishandled by officers. *Id*. Banks concluded that Sewell appeared to have "a delusion of persecution as he stated the same about officers at other facilities he has been." *Id*.

Five days later, Sewell came to the RCI SNU Group meeting in the chapel where participants were given an opportunity to engage in recreational activities. ECF No. 24 at Ex. 7, p. 21. When he arrived, Thomas Dunne, LCPC, noted that Sewell's mood was agitated and when he approached him, Sewell stated that the "3-11 officers are taking my mail." *Id*. Although Dunne states he calmed Sewell down, he notes that for the rest of the group period Sewell "sat quietly against a wall, brooding." *Id*. When Dunne spoke with the Chief

---

[6]   Sewell takes issue with the characterization of the letter as "inappropriate." ECF No. 29. He provides a copy of the letter he gave to Ward. ECF No. 29-2 at pp. 19 – 21. Sewell's stated purpose for the letter is that he senses "something seriously wrong going on in [Ward's] life." *Id*. at p. 19. In addition, he states: "I'm not your enemy nor am I the one who hurt you, that's the way you make me feel:  a surge of fear, anger, and desire to be free fills me to overflowing, but when I think of you and that hypnotic look in your eyes with a precipitation of sadness in which I am not allowed to engage." *Id*.  The letter expresses sentiments that are not appropriate in the context of a therapeutic relationship between a therapist and a patient.

Psychologist about the incident, Dunne states he was told that Sewell's claim regarding mail is a well-known issue and that "he holds a paranoid delusional thought content that has been exhibiting recently."[7] *Id.*

On November 4, 2015, Sewell was seen by Mindy Baker, RN, concerning his noncompliance with mental health medication.  ECF No. 24 at Ex. 7, p. 22.  She noted that Sewell had missed four out of four doses of Prozac and Lithium.  *Id.*  Sewell told Baker that people had been manipulating his medications and that for the last 30 days his medication "looked different."  *Id.*  Specifically, Sewell stated that his Lithium used to be white, but is now gray and since the change in color he has experienced migraines.  *Id.*  Baker showed Sewell that different manufacturers make the medications in different colors and he indicated that he understood.  *Id.*

Sewell filed an ARP complaint regarding changes in the appearance of his medications on September 4, 2015.  ECF No. 24 at Ex. 8, pp. 2 – 5 (ARP  RCI-0521-15).  The ARP alleges that from June 2013 to the present, medical and pharmacy staff along with "specific staff from North Branch to RCI" are denying Sewel medical treatment for his "heart valves" by giving him medication that is "the same color as Ecotrin but is something totally different."  *Id.* at p. 2.  He further claimed that for the past six weeks he had not been provided "heart valve meds because someone took them out of my medication sheet" after they were reordered in July and August 2015.  *Id.*  Sewell alleges, as he does in the instant case, that the conduct alleged against staff at RCI is the same conduct he was subjected to at NBCI, where correctional staff worked with medical staff to cause his health to decline.  *Id.* at p. 3.  As a remedy Sewell requested the Warden "take meaningful action to have my Ecotrin restored and provided to me without it being altered or made to look like a completely different medication."  *Id.*  In addition, he asked that

---

[7]    Sewell filed the instant civil action on October 5, 2015.  ECF No. 1.

"the random retaliatory conduct come to an (sic) complete end because I've suffered multiple internal and external injuries as a result of medical poisonings." *Id.* Sewell adds that Dr. Ottey prescribed thyroid medication for him in 2014 without ever diagnosing him or examining him and the medication made his condition worse since arriving at RCI. *Id.*

The Warden's response to Sewell's ARP states as follows:

> Your request for Administrative Remedy has been investigated and has been DISMISSED. Your complaint is that you have been denied medical care for you heart valves, and medication you have been receiving has caused you medical problems. You claim that after you received an x-ray, that you have arthritis in your neck and shoulder. You have been educated at length regarding about (sic) the medications that are distributed to the medical departments use, changes in appearance of off-patient medications, normal changes due to aging and previous orthopedic injuries. Your labs were reviewed, along with need for certain medications.

ECF No. 24 at Ex. 8, p. 2. An additional ARP filed by Sewell at RCI is not included in the records provided by Defendants. *See id.* at Ex. 9 and 10.

Sewell filed an appeal with the Commissioner of Correction on March 30, 2016, concerning a different ARP (RCI-0132-16) (*see* ECF No. 26-11 – 26-15, ARP and appeal) in which he claimed that he is not receiving adequate mental health care in violation of his rights. ECF No. 24 at Ex. 12, p. 2. The ARP was dismissed by the Warden based on his view that no policy, rule, or regulation had been violated and that psychology staff had followed all policies and procedures. *Id.*

According to a sworn declaration from Russell A. Neverdon, Executive Director of the Inmate Grievance Office (IGO), Sewell has not filed any grievances with the IGO since 2011. ECF No. 24 at Ex. 11.

**Standard of Review**

<u>Motion to Dismiss</u>

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the

sufficiency of the Plaintiff's complaint.  *See Edwards v. Goldsboro,* 178 F.3d 231, 243 (4th Cir.

1999).  The Supreme Court articulated the proper framework for analysis:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain
> statement of the claim showing that the pleader is entitled to relief," in order to
> "give the defendant fair notice of what the . . . claim is and the grounds upon
> which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (*abrogated on other
> grounds*).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss
> does not need detailed factual allegations, *ibid.*; *Sanjuan v. American Board of
> Psychiatry and Neurology, Inc*., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's
> obligation to provide the  "grounds" of his "entitle[ment] to relief" requires
> more than labels and conclusions, and a formulaic recitation of the elements of
> a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986)
> (on a motion to dismiss, courts "are not bound to accept as true a legal
> conclusion couched as a factual allegation").  Factual allegations must be
> enough to raise a right to relief above the speculative level, see 5 C. Wright &
> A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)
> (hereinafter Wright & Miller) ("[T]he pleading must contain something more .
> . . than . . . a statement of facts that merely creates a suspicion [of] a legally
> cognizable right of action"), on the assumption that all the allegations in the
> complaint are true (even if doubtful in fact), *see, e.g.*, *Swierkiewicz v. Sorema
> N.A.*, 534 U.S. 506, 508, n.1 (2002); *Neitzke v. Williams*, 490 U.S. 319,
> 327(1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a
> judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416
> U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears
> "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (footnotes omitted).

This standard does not require defendant to establish "beyond doubt" that plaintiff can

prove no set of facts in support of his claim which would entitle him to relief.  *Id.*  at 1968-69.

Once a claim has been stated adequately, it may be supported by showing any set of facts

consistent with the allegations in the complaint.  *Id.* at 1969.  The court need not, however,

accept unsupported legal allegations, *see Revene v. Charles Cty Comm'rs,* 882 F.2d 870, 873 (4th

Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Defendant Coble has filed a motion to dismiss the complaint against her on the basis that the complaint, as supplemented, does not contain a specific allegation against her that states a cognizable claim.  ECF No. 17.  Coble is a Nurse Practitioner in the Psychiatry Department at RCI and is only mentioned by Sewell in the complaint as having deleted medications "used to induce suicide attempts."  ECF No. 1 at p. 2.  The allegation does not state a constitutional claim and Coble is entitled to dismissal of the complaint against her.  The motion shall be granted.

## 28 U.S.C. §§1915A and 1915(e)

In addition to the standard outlined above for 12(b)(6) dismissal, this court is obliged by 28 U.S.C. § 1915A to screen prisoner complaints and dismiss any complaint that is frivolous, malicious or fails to state a claim upon which relief may be granted.  In deciding whether a complaint is frivolous "[t]he district court need not look beyond the complaint's allegations . . . . It must, however, hold the pro se complaint to less stringent standards than pleadings drafted by attorneys and must read the complaint liberally."  *White v. White,* 886 F. 2d 721, 722-723 (4th Cir. 1989).  Under the provisions of 28 U.S.C. § 1915(e)(2) a case "shall be dismissed at any time if the court determines that– (A) the allegation of poverty is untrue; or (B) the action or appeal– (i)is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

In addition to the Defendants who were served with the complaint, Sewell names as Defendants Bruce Liller, Laura Booth, and Deidre Mull of the NBCI psychology department and Captain Greg Werner and Lt. T. Sawyer.  ECF No. 5 at p. 1.  These unserved Defendants are

named in the caption of the complaint, but no allegations against them are raised in the complaint. Rather, it appears Sewell's intent in naming these Defendants is to revisit his previously litigated claims regarding a conspiracy against him at NBCI in support of his theory that there is an ongoing conspiracy against him.

To establish a civil conspiracy under §1983, Plaintiff must present evidence that defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of conspiracy to deprive Plaintiff of a constitutional right, is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv*., 815 F.2d 1001, 1006-07 (4th Cir.1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagon v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir.1981). Sewell has failed to allege the required agreement between staff at NBCI, where he was formerly confined, and staff at RCI, where he is currently held and where the remaining Defendants work. The complaint against the unserved Defendants shall be dismissed.

<u>Summary Judgment</u>

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on

those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.   In *Anderson v. Liberty Lobby, Inc*., the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. at 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id*. at 252.

In undertaking this inquiry, this court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment.  *See Anderson*, 477 U.S. at 252.

This court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted).  Indeed, this court has an affirmative obligation to

prevent factually unsupported claims and defenses from going to trial.  *See Drewitt v. Pratt*, 999

F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128

(4th Cir. 1987)).   Sewell's claims as to the remaining Defendants are analyzed under this

standard below.

## Analysis

### Eighth Amendment Claim

With respect to Defendants Coble, Ottey, and Clark,[8] Sewell's claim appears to concern a

denial of medical and psychological care for serious physical and mental health conditions.  The

Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its

guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute

and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003)

(citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   In order to state an Eighth Amendment

claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants

or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle

v. Gamble*, 429 U.S. 97, 106 (1976).   "Deliberate indifference is a very high standard – a

showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with

deprivations of rights, not errors in judgments, even though such errors may have unfortunate

consequences . . . To lower this threshold would thrust federal courts into the daily practices of

local police departments."  *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the

prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

---

[8]    To the extent that Sewell's claims regarding his psychological and medical care are meant also to implicate
other Defendants, the court's analysis also applies to those claims.

23

staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such

disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id*. The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id*. at 48.

It is clear from the objective evidence, established through verified medical and mental health records as well as declarations under oath, that Sewell has not only received constitutionally adequate care, but that any gaps in his care are the result of his refusal to comply with the treatment plans put into place for his care. Sewell's opposition response, when read as a whole, is a restatement of his beliefs that: his own diagnoses of his physical condition should dictate the course of care chosen; virtually every staff member he encounters has either lied about test results or somehow engaged in a conspiracy against him; and changes in appearance of his medication is the equivalent of a change in "compounds" of the medication. ECF No. 26. Sewell includes records from the Western Maryland Regional Medical Center where he was hospitalized after his intentional overdose and states without explanation that the records could have been altered. *See* ECF No. 26 at p. 5; ECF No. 26-5 – 26-9 (hospital records). His unfounded beliefs persist despite numerous documented attempts to educate and reassure him that they are in fact unfounded. All of Sewell's chronic medical conditions are treated on a regular basis and addressed through prescribed medication and diet. There appears to be little else medical staff can do to allay Sewell's fears and gain his compliance absent his cooperation.

Sewell's assertions regarding his psychological care and treatment are also not supported by objective evidence. While it is disconcerting that Sewell's persecutory beliefs and paranoia have been the basis for the allegations raised in the complaint, it is clear that efforts to gain his compliance with a medication regime to address the issue are ongoing and the main obstacle in

treatment is Sewell himself.   Sewell is currently enrolled in a program at RCI specifically designed to address the needs of inmates who are suffering from serious mental health issues. Sewell's claim that he is not enrolled in a program for treatment of PTSD is not enough to establish an Eighth Amendment claim where, as here, he is receiving other care and he has been informed that his access to that program merely requires him to take action to enroll.   Defendants are entitled to summary judgment in their favor on Sewell's claims that he is denied adequate medical and psychological care.

Exhaustion of Administrative Remedies

Defendants Bible, Finucane, Henrich, Boozel, Newlin, Shearin, and Ward raise the affirmative defense of non-exhaustion and assert Sewell's claims that have not been properly presented through the administrative remedy procedure must be dismissed pursuant to 42 U.S.C. §1997e.   The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, Sewell is subject to the strict requirements of the exhaustion provisions.   It is of no consequence that Sewell is aggrieved by a single occurrence, as opposed to a general conditions of confinement claim.   *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).   Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure.   *See*

26

*Booth v. Churner*, 532 U.S. 731, 741 (2001).  A claim which has not been exhausted may not be considered by this court.  *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials."  *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007).  The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.  *Id.*; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are.  *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006).  Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively.  <u>Id.</u> at 87.  Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond.  *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Exhaustion is mandatory.  *Ross*, 136 S.Ct. at 1857, *Jones v. Bock,* 549 U.S. 199, 219 (2007).  A court may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856, citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion").  The purpose of exhaustion is to:  1) allow a prison to address complaints about the program it administers before being subjected to suit; 2) reduce litigation to the extent complaints are satisfactorily resolved; and 3) prepare a useful record in the event of litigation.  *Jones,* 549 U.S. at 219.   An inmate's failure to exhaust administrative remedies is an affirmative defense; defendant bears the burden of proving that he had remedies available to him of which he failed to take advantage.  *Jones,* 549 U.S. at 211–12, 216; *Moore*, 517 F.3d at 725**.**  The PLRA's exhaustion requirement is designed so that prisoners pursue

administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level") (abrogated on other grounds); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Three purposes underlie the PLRA's exhaustion requirement: "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court of the United States identified three kinds of circumstances in which an administrative remedy is unavailable. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In Maryland, filing a request for administrative remedy ("ARP") with the warden of the prison is the first of three steps in the ARP process. *See* Code of Md Regs. ("COMAR"), tit. 12

§07.01.04.   The ARP request must be filed within 30 days of the date on which the incident

occurred, or within 30 days of the date the inmate first gained knowledge of the incident or

injury giving rise to the complaint, whichever is later. COMAR, tit. 12 §07.01.05A.   If the

request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of

Correction. COMAR, tit. 12 §07.01.05C.  If the appeal is denied, the prisoner has 30 days to file

a grievance with the Inmate Grievance Office.  *See* Md. Corr. Servs., Code Ann. §§10-206, 10-

210; COMAR, tit. 12 §§ 07.01.03 and  07.01.05B.

Despite Sewell's litigious nature, it does not appear that he properly utilizes the

administrative remedy procedure in place to address claims regarding his mail or claims that he

is threatened by other inmates.   In response to the assertion that he has failed to exhaust

administrative remedies, Sewell simply states that he has been prevented from filing appeals with

the Commissioner's office or the IGO, and references ARPs he attempted to file while confined

at NBCI.  ECF No. 29 at pp. 9 – 10. He does not address his failure to utilize the administrative

remedy procedure regarding his claims arising at RCI.   Thus, it appears that Sewell's multiple

claims of widespread abuse involving staff and inmates at two different prisons have not been

exhausted.  Even assuming that Sewell's claim that administrative remedies were not available to

him, Defendants are entitled to summary judgment in their favor on the merits of the claims

asserted.

Access to Courts

Prisoners have a constitutionally protected right of access to the courts.  *See Bounds v.*

*Smith*, 430 U. S. 817, 821 (1977).  However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into
> litigating engines capable of filing everything from shareholder derivative actions
> to slip-and-fall claims.  The tools it requires to be provided are those that the
> inmates need in order to attack their sentences, directly or collaterally, and in

order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997), quoting *Lewis*, 518 U.S. at 355. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 352-352.

In *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), the Court characterized access-to-the courts claims as being in one of two categories. *Id.* at 413. The first, termed "forward looking claims," are cases where official action frustrates a plaintiff's ability to bring a suit at the present time. *Jennings v. City of Stillwater*, 383 F.3d 1199, 1208-09 (10th Cir. 2004). The second class, termed "backward looking claims," arise when a plaintiff alleges that a specific claim "cannot be tried (or tried with all the evidence) [because past official action] caused the loss or inadequate settlement of a meritorious case." *Id*. at 1209. In this way, the official action is said to have "'rendered hollow [the plaintiff's] right to seek redress'" in the courts. *Id*. (quoting *Christopher*, 536 U.S. at 415 (brackets in original) (internal citations omitted)).

Whether the claim is forward or backward looking, a prisoner claiming he was denied access to the courts must ultimately prove he suffered an actual injury by showing that the

defendant's acts hindered his ability to pursue a nonfrivolous legal claim. Conclusory allegations are not sufficient in this regard. *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not even mention the point on appeal). The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415.

Sewell's claims regarding access to courts involve his appeal of this court's decision in Civil Action DKC-12-2656 and his state petition for writ of habeas corpus in the Circuit Court for Montgomery County. With regard to his appeal to the Fourth Circuit, Sewell asserts that he "only sent one letter to the Fourth Circuit" and that letter, dated April 2, 2015, was his request for crisis intervention. ECF No. 29 at p. 2. He suggests that any other correspondence filed was not filed by him and, seemingly, those documents adversely affected the outcome of his case and are the responsibility of Defendants generally. *Id.* Specifically, Sewell states that in Appellate Case No. 15-6316, the docket entries at Doc. 11 and 28 are his papers, but the ones at Doc. 23 and 24 are not.[9] *Id.* It is clear, however, from a review of the Fourth Circuit docket that Sewell did not miss a filing deadline and filed multiple pleadings in the appeal. His lack of success in the appeal had nothing to do with either his inability to meet a deadline, or someone intervening in the case without his consent to somehow alter the claims he raised.

With respect to Sewell's state habeas petition, it does appear from the docket provided by Defendants that Sewell failed to comply with Maryland Rule 5-302(b)(2)(A – E). ECF No. 24 at Ex. 4. That failure did not involve a missed deadline as there is no indication on the state docket that Sewell was first directed to provide the missing information, failed to do so, and then had his

---

[9] This court viewed the two documents Sewell claims were filed by someone other than him. Both are written in the same handwriting as Sewell's. *See Sewell v. Office of the Attorney General of Md, et al.*, No. 15-6316 (4th Cir.) at Dkt. 23 and 24.

petition dismissed.  *See Sewell v. Stouffer*, Case No. 31303M (Mont. Co. Cir. Ct.) at
http://casesearch.courts.state.md.us/inquiry.

Even if that were the case, the claim asserted does not provide enough detail about the underlying merits of the claim raised in the state habeas petition for this court to determine if Sewell lost an opportunity to present a meritorious claim.  Sewell must establish that his underlying claim was "nonfrivolous" or "arguable."  *Christopher v. Harbury*, 536 U.S. at 415. "[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show the 'arguable' nature of the underlying claim is more than hope."  *Id*. at 416 (footnote omitted).  A prisoner's right to access the courts does not include the right to present frivolous claims.  *Lewis v. Casey*, 518 U.S. at 353 & n. 3.  It is not enough that a prisoner is prevented from challenging his conviction.  He must also show that his claim had merit.  Sewell's mention in several papers that he should not have been convicted of the crimes for which he was sentenced, is not sufficient to establish that the predicate claim was not frivolous.

Thus, even if Sewell could establish he was prevented from filing papers in either court, he has failed to show a causal connection between the alleged misconduct and the adverse outcome of his cases and he cannot establish an actual injury.  Defendants are entitled to summary judgment in their favor on this claim.

<u>Mail Claim</u>

Prisoners have a First Amendment right to send and receive mail.  *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).  The claim asserted by Sewell does not implicate a policy or practice implemented by the named Defendants that has resulted in his inability to send or receive mail.  Rather, his claim concerns incidents where he alleges he provided outgoing mail to both correctional and medical staff and it did not arrive at its intended destination.  *See generally*

ECF Nos. 26 and 29.   Despite instances where Sewell's concerns regarding his mail were specifically addressed by staff to allay his fears (*see e.g.,* ECF No. 21 at Ex. 1, p. 81 and ECF No. 24 at Ex. 7, p. 17), his belief that he is targeted for mail tampering at every prison where he has been confined remains undaunted.  *See* ECF No. 29 at p. 11.  As discussed *supra*, there is no evidence that Sewell has been prevented from mailing legal papers in existing and new litigation. The generalized claim regarding mail tampering is without merit and Defendants are entitled to summary judgment on this claim.

<u>Failure to Protect Claim</u>

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm.  *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987).  "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency.   Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837, *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, __ F.3d __, 2016 WL1056091*2 (4th Cir.

2016), citing *Farmer* 511 U.S. at 825.   Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'"   *Id*.   "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victims safety."   *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).   A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor* 2016 WL at *3.

To the extent Sewell's claim that he is harassed and "targeted" by the "death row[10] guys" during his confinement in both NBCI and RCI, his claim must fail.   When Sewell made the specific claim that he was targeted for a "hit" by the BGF security threat group, staff were quick to respond and investigate his claim.   When Sewell made it clear that the basis of his belief was an alleged non-delivery of legal mail, that claim was objectively proven to be false.   His assertions that unnamed groups of inmates mean him harm are claims that are simply not amenable to meaningful solutions without requiring an enormous expenditure of resources. Without any objective evidence that a known risk of harm exists, prison officials are not required to engage in such expenditures.   Sewell's generalized claims concerning the alleged death of other inmates and his assignment of nefarious intent to otherwise innocuous encounters with staff fits within the parameters of his diagnosed mental illness and does not constitute a basis for providing additional precautions to insure his physical safety.   Defendants are entitled to summary judgment on this claim.

---

[10]   It is unclear what group of inmates Sewell is referencing in light of the fact that the State of Maryland repealed the death penalty in 2013.   *See* S.B. 276, 433rd Gen. Assemb., Reg. Sess. (Md. 2013), repealing Md. Code Ann., Crim. Law §2-202 eff. October 1, 2013.

Retaliation

In order to prevail on a claim of retaliation, Sewell "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *Compare Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim). "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Maryland, Inc. v. Wicomico County*, Md. 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) quoting *Adams v. Rice*, 40 F.3d 72,74 (4th Cir. 1994).

Sewell cannot sustain a claim of retaliation on the facts alleged in the complaint.  Even assuming his litigation is the protected activity on which he relies for the claim, he can point to no adverse actions against him as a result of that activity.   Sewell does not allege that disciplinary action has been taken against him while at RCI, nor has he been removed from programs he was placed in for his benefit.  Indeed, it appears the only "adverse action" Sewell relies on is the failure of prison officials to launch a full scale investigation into his global complaint that he has been subjected to various forms of harassment at every prison in which he has been confined.  As the objective evidence submitted by Defendants establishes, Sewell's repetitive claims regarding mail and changes in the appearance of his medication have been patiently and repeatedly addressed.  Defendants are entitled to summary judgment on this claim.

A separate Order dismissing the complaint as to Defendant Coble and unserved Defendants Liller, Booth, Mull, Werner, and Sawyer and granting summary judgment in favor of Defendants Ottey, Clark, Ward, Finucane, Boozel, Newlin, Henrich, and Bible, follows.


  November 2, 2016            _____/s/_____
                             DEBORAH K. CHASANOW
                             United States District Judge